[No. D026372. Fourth Dist., Div. One. July 7, 1998.]

FRANK LUDWIG et al., Plaintiffs and Appellants, v.
CITY OF SAN DIEGO et al., Defendants and Respondents.

1106

**COUNSEL**

Dan Zeidman and James T. Biggs for Plaintiffs and Appellants.

Casey Gwinn, City Attorney, and Penny L. Castleman, Deputy City Attorney, for Defendants and Respondents.

## OPINION

**O'NEILL, J.**[*]—Plaintiffs Frank Ludwig and his wife Lori Ludwig filed an action against the City of San Diego (the City) and Bill Jones, a traffic inspector employed by the City, seeking damages for injuries Frank suffered at his job when an excavated trench collapsed on him and for Lori's loss of consortium.[1] The complaint alleges Jones caused the trench to collapse by negligently or intentionally delaying the laying of pipe and slurry[2] in the trench. Ludwig appeals a summary judgment in favor of defendants, contending the court erred in concluding Jones did not owe him a duty of care. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

At the time of the accident, Ludwig was working for PCL Civil Constructors (PCL) as a foreman on a contract to lay nine-foot-diameter water pipe in an excavated trench at 70th Street and El Cajon Boulevard in San Diego. Before starting the work, PCL obtained the City's approval of a traffic control plan for the job and a traffic control permit, as required by ordinance. The traffic control plan and permit issued to PCL provided that work on the construction site could not start before 9 a.m. and had to stop by 3 p.m. The plan also required that there be an open lane of traffic in each direction on 70th Street adjacent to the construction site.

As a principal traffic engineer aide (PTEA) for the City, it was Jones's responsibility to visit the construction site and ensure PCL was following the traffic control plan. A PTEA can orally permit a contractor to deviate from a traffic control plan, but such permission is only effective during the time the PTEA is present at the site.

When PCL began excavating at 70th Street and El Cajon Boulevard, on June 3, 1993, it became clear that the crane used to drop the sections of pipe into the trench would have to be operated adjacent to the trench rather than

_____

[*]Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]Although both plaintiffs jointly appeal, for convenience we hereafter use "Ludwig" to refer to Frank Ludwig only, as Lori Ludwig's claim for loss of consortium is derivative of Frank's claims.

[2]Ludwig explains that slurry is a cement mixture which is poured into the trench and on top of the inlaid pipe to set the pipe in place and stabilize the walls of the trench.

at the head of the trench because of overhead power lines. However, operating the crane adjacent to the trench required PCL to close a lane of traffic on 70th Street while the crane was in use because the crane's counterweight extended into the traffic lane. From June 3 to June 8, PCL used the crane in this manner and temporarily closed the obstructed traffic lane four or five times a day in violation of the traffic control plan.[3]

On the afternoon of June 8, close to 3 p.m., Jones inspected the site and told Ludwig he would have to stop work at the time required by the traffic control plan. At his deposition Ludwig testified: "I remember asking [Jones] that I wouldn't be very much longer, would it be okay if I just finished it up, because I already had slurry trucks ordered and they were sitting there." Jones denied Ludwig permission to work past 3 p.m. so Ludwig told his crew to quit for the day. Ludwig testified, however, that Jones said his son Chad was available if Ludwig needed a flagman, and that if Ludwig had an experienced flagger like Chad, Jones would let the work continue as late as 5:30 p.m. Chad had been fired by another PCL foreman the day before for being late to work. Ludwig told Jones he did not need anybody else on his crew. However, the next day Chad Jones was rehired by PCL and assigned to Ludwig's jobsite.

On the morning of June 9, Jones returned to the worksite. His presence inhibited Ludwig from operating the crane adjacent to the trench and blocking a lane of traffic in violation of the traffic control plan as he had previously done. Consequently, Ludwig and job superintendent Thomas Bussell refrained from doing any further work and spent the entire morning trying to obtain permission from the owner of an adjacent gas station to operate the crane from the station's parking lot.

When the gas station owner finally told Bussell the crane could not be operated on his property, Bussell told Ludwig to talk to Jones about the possibility of operating the crane adjacent to the trench. Jones approached Ludwig and asked if there was a problem. Ludwig testified he told Jones he was unable to lay pipe and was considering backfilling the trench because he could not operate the crane from the gas station. According to Ludwig, Jones then offered to close off a lane of 70th Street by detouring traffic around it. Jones set up the detour while Ludwig's crew went to lunch. About 2 p.m. Ludwig finally moved the crane into position to lay the pipe.

About 3 p.m. Ludwig and Benny Corrales, an independent truck driver, were standing next to the trench when it collapsed. Corrales was killed when he was buried in the trench, and Ludwig was injured.

---

[3]PCL "flagged" the traffic, which means it alternately stopped traffic traveling in one direction while traffic traveling the opposite direction was diverted around the crane in the open lane.

In April 1994 Ludwig filed a complaint against the City and Jones, pleading causes of action for general negligence and an unspecified intentional tort. In the negligence cause of action, Ludwig alleged that on June 9, 1993, Jones "abused his position and caused delays in the laying of [pipe] through extortion-like behavior in order to force [Ludwig's] employer . . . to hire [Jones's] son, i.e., nepotism." The delay in laying pipe and slurry allegedly caused the trench to weaken and collapse.[4]

The City and Jones moved for summary judgment on the ground neither Jones nor any other City employee caused the delay of work on *June 9*, as alleged in the complaint.[5] The court initially denied the motion, but reversed that ruling, set the matter for further hearing and ordered the parties to submit supplemental briefs on the issue of duty. The court ultimately granted the motion on the ground Ludwig failed to establish a duty on the part of Jones because there was no evidence Jones knew or reasonably should have known that allowing the trench walls to dry overnight would render them unstable.

## DISCUSSION

■ On appeal from a ruling on a motion for summary judgment, the appellate court conducts its own independent review of the moving and opposition papers and applies the same standard as the trial court in determining whether the motion was properly granted. (*California Aviation, Inc.* v. *Leeds* (1991) 233 Cal.App.3d 724, 730-731 [284 Cal.Rptr. 687].)

■ Ludwig contends the court erred in concluding Jones owed him no duty of care. ■ "The question of 'duty' is decided by the court, not the jury." (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].) Duty is not an immutable fact, but rather an expression of policy considerations leading to the legal conclusion that a plaintiff is entitled to a defendant's protection. (*Parsons* v. *Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70].) "Some of the considerations that courts have employed in various contexts to determine the existence and scope of duty are: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with

---

[4]Ludwig asserts only respondeat superior liability against the City.

[5]June 9 was the day the collapse occurred. June 8 was the day Jones refused to allow Ludwig to slurry the trench after 3 p.m. Other than being present at the site, there is no evidence that Jones did anything to cause the delay on the morning of June 9 while Ludwig and Bussell were negotiating with the owner of the adjacent gas station.

resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]' [Citation.]" (*Id.* at p. 473; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

 Ludwig contends the court erroneously viewed foreseeability of harm to the plaintiff as the threshold test for duty and thus erroneously granted summary judgment based solely on the absence of evidence to support a finding of such foreseeability on the part of Jones. Ludwig asserts the courts have unanimously held duty must be determined by balancing *all* of the above noted factors.

Under Ludwig's reasoning, the other policy considerations could warrant imposition of negligence liability on a defendant for failing to protect against a risk of harm even if the harm was not reasonably foreseeable to the defendant. Such a result would be contrary to the basic fault principle underlying negligence liability. The element of fault in negligence liability lies in the defendant's breach of a duty of care owed to "persons who are *foreseeably endangered* by [the defendant's] conduct, with respect to all risks which make the conduct unreasonably dangerous." (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 399 [115 Cal.Rptr. 765, 525 P.2d 669], italics added.) "[W]ithout evidence that a defendant knew or reasonably should have known there was any danger or potential danger associated with that defendant's act or failure to act, any imposition of liability would in essence be the imposition of liability without fault." (*Butcher* v. *Gay* (1994) 29 Cal.App.4th 388, 403 [34 Cal.Rptr.2d 771], fn. omitted.) Since liability for unforeseen and unforeseeable consequences of one's conduct is liability without fault and not negligence liability, the court correctly viewed foreseeability of harm as the primary and threshold consideration in determining whether Jones owed Ludwig a duty of care.

Our conclusion is amply supported by case law. In *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], the California Supreme Court stated: "In order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable. [¶] In the absence of 'overriding policy considerations . . . foreseeability of risk [is] of . . . primary importance in establishing the element of duty.' [Citations.] As a classic opinion states: '[t]he risk reasonably to be perceived defines the duty to be obeyed.' [Citation.] Defendant owes a duty, in the sense of a potential liability for damages, only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent, in the first instance. [Citations.]"

In *Lopez* v. *McDonald's Corp.* (1987) 193 Cal.App.3d 495 [238 Cal.Rptr. 436], this court noted: "An analysis of the decisional trend of theoretical negligence liability in California shows clearly that '*Dillon* . . . postulated reasonable foreseeability as the primary, court-determined test of liability and relegated to a secondary, negative role the policy factors involved in the duty-of-care issue.' [Citation.]" (*Id.* at p. 508, fn. 7.)[6] In *Sun 'N Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671, 695 [148 Cal.Rptr. 329, 582 P.2d 920], the Supreme Court stated: "It is settled . . . that 'the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk . . . .' [Citations.]"

*Sturgeon* v. *Curnutt* (1994) 29 Cal.App.4th 301 [34 Cal.Rptr.2d 498] noted foreseeability is the first of the duty-of-care considerations listed in *Rowland* v. *Christian, supra,* 69 Cal.2d at page 113. *Sturgeon* stated: "While we characterize foreseeability as a consideration, it is more than that. *If the court concludes the injury was not foreseeable, there was no duty. There is no need to discuss the remaining considerations.*" (*Sturgeon* v. *Curnutt, supra,* 29 Cal.App.4th at p. 306, italics added.)[7]

We agree with *Sturgeon*. Negligence is a fault-based theory of liability, and the defendant's fault stems directly from the reasonable foreseeability that his or her conduct will harm another. Accordingly, in the context of negligence liability, foreseeability of harm is essential to a legal finding of duty.

In the present case there is no evidence Jones knew on June 8 that leaving a trench unslurried overnight creates a risk the trench will collapse. Nor is there any evidence that a PTEA reasonably should know about such aspects of a construction project from his or her experience and training in traffic engineering. Ludwig testified that he told Jones he wanted to work past the time restriction in the traffic control plan because he had already ordered the slurry trucks and they were at the site. There is no evidence that Ludwig expressed any safety concerns to Jones, that he pleaded with Jones for permission to continue working, or that he told Jones he only needed an additional 30 to 60 minutes to slurry the trench. Nor is there evidence Ludwig told Jones he needed to pour the slurry to stabilize the walls of the trench or that it was his practice to always pour slurry over the last pipe laid

---

[6]*Dillon* did not view reasonable foreseeability only as a general test for negligence liability but as a consideration of " 'primary importance in establishing *the element of duty.*' [Citations.]" (*Dillon* v. *Legg, supra,* 68 Cal.2d at p. 739, italics added.)

[7]Case law indicates that the remaining considerations are not alternative bases for a finding of duty where foreseeability is absent. Rather, they come into play where foreseeability is present, but there is an issue as to whether foreseeability alone is sufficient to warrant imposition of liability. (See *Parsons* v. *Crown Disposal Co., supra,* 15 Cal.4th at p. 476.)

and joined in a trench before leaving work for the day.[8] Jones testified that he knew nothing about soil textures and was unaware that leaving a trench open too long before pouring slurry over pipe laid in it creates a risk of collapse. There is no evidence in the record that suggests a PTEA reasonably should have such knowledge.

The crux of Ludwig's case is that Jones shut down the job on June 8 out of spite because Ludwig told Jones he did not want to hire Jones's son, Chad. Ludwig argues we must consider the moral blame attached to Jones's abuse of his position in determining foreseeability and duty. Ludwig frames the foreseeability issue as follows: "Was a trench collapse a foreseeable calamity where a corrupt public traffic inspector jeopardizes safety for the sake of extorting a job for his own son?"

Ludwig asks the wrong question. A PTEA who unreasonably jeopardizes safety is negligent regardless of his or her reason for doing so. The proper question regarding foreseeability is: Should Jones reasonably have known that denying Ludwig permission to continue working long enough to slurry the trench on June 8 created a risk that the trench would collapse the following day? If so, Jones would be negligent regardless of his reason for stopping the work. Likewise, if stopping the work in accordance with the traffic control plan did *not* create a reasonably foreseeable risk of harm, Jones was not negligent, regardless of any animus motivating his strict enforcement of the time restriction. ■ An act which is not negligent in the first instance cannot be transformed into negligence after the fact by proof it was motivated by ill-will.

Thus, for purposes of duty analysis, moral blame attaches to the fact a defendant's conduct is negligent—i.e., to defendant's fault in creating an unreasonable risk of harming others—not to the motive underlying the defendant's negligent conduct. Accordingly, moral blame increases as a defendant's conduct moves on the fault continuum from ordinary negligence to gross negligence and wanton, reckless conduct. Because the moral blame stems directly from the defendant's fault in acting negligently, there obviously is a causal connection between the defendant's blameworthy conduct and the injury in question.

■ That essential connection is lacking in Ludwig's analysis. Ludwig attaches moral blame to Jones's *motive* for stopping work on June 8 without

---

[8]Ludwig cites his own history of never leaving a trench unslurried overnight as evidence that Jones should have foreseen the risk of harm created by failure to slurry in a timely fashion. However, the evidence indicates Ludwig was not concerned about safety issues regarding the delay in pouring slurry. He expressed no such concern to Jones on June 8 or 9, and did not hasten to slurry the trench on June 9, but rather spent the entire morning negotiating with the gas station owner regarding use of the crane in his property.

establishing his *negligence* in doing so.[9] Jones's motive for stopping the work simply has no bearing on whether the trench collapse was a reasonably foreseeable consequence of stopping the work. Hence, the moral blame Ludwig assigns to Jones's conduct does not impact our duty determination.

■ "[A] court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6.)

■ The category of allegedly negligent conduct at issue here is a traffic safety engineer's requiring a crew to stop work in accordance with a traffic control plan instead of allowing the crew to continue working long enough to slurry an open trench. There is no evidence to support the conclusion that such conduct on the part of a PTEA is sufficiently likely to cause a trench to collapse that a PTEA should reasonably be aware of the risk and be subject to liability for failing to protect against it. To the extent Ludwig contends the general category of negligent conduct at issue is denying permission to work beyond time restrictions in retaliation for a contractor's refusal to hire a family member, we reiterate that Jones's motive for stopping the work in accordance with the traffic control plan could in no way affect the foreseeability that the stoppage could result on a trench collapse.

The court correctly granted summary judgment on the ground Jones did not breach a duty of care owed to Ludwig.[10]

### DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and McIntyre, J., concurred.

A petition for a rehearing was denied July 29, 1998, and appellants' petition for review by the Supreme Court was denied September 23, 1998.

---

[9]At oral argument on the City's summary judgment motion, Ludwig's counsel stated: "The negligent conduct is not [Jones's] stopping the job, it's stopping the job for personal reasons only . . . ."

[10]Because Ludwig does not address his intentional tort cause of action we deem it abandoned. (*Tan* v. *California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811 [189 Cal.Rptr. 775].)